Maxx Phillips (HI Bar No. 10032)
CENTER FOR BIOLOGICAL DIVERSITY
1188 Bishop Street, Suite 2412
Honolulu, HI 96813
Phone: (808) 284-0007
Email: mphillips@biologicaldiversity.org

Amy R. Atwood (OR State Bar No. 060407)
*pro hac vice application forthcoming*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Phone: (917) 717-6401
Email: atwood@biologicaldiversity.org

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation,<br><br>    *Plaintiff*,<br><br>       v.<br><br>SCOTT DE LA VEGA, in his official capacity as Acting Secretary of the Interior; U.S. FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of Commerce,<br><br>    *Defendants*. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION

1.      In this civil action for declaratory and injunctive relief, Plaintiff

Center for Biological Diversity (the "Center") challenges the failure of the

Secretary of the Interior and the U.S. Fish and Wildlife Service (collectively, "the

Service") to designate critical habitat and develop a valid recovery plan for the

'i'iwi (*Drepanis coccinea*), a threatened native Hawai'ian bird species, as required

under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.  The

Service's failure to timely designate critical habitat for 'i'iwi violates its mandatory

duties under section 4 of the ESA, 16 U.S.C. § 1533.  Likewise, the Service's

failure to timely develop and implement a recovery plan for 'i'iwi violates its

mandatory duties under section 4 of the ESA, 16 U.S.C. § 1533.  Compliance with

these mandatory, nondiscretionary duties are necessary to ensure the continued

survival and eventual recovery of this imperiled species.  These inexcusable delays

deprive the threatened 'i'iwi of vitally important protections in its most essential

habitat areas and at its greatest time of need.



An ʻiʻiwi (*Drepanis coccinea*) in an ʻōhiʻa tree.  Credit: Keith Burnett

2.      Hawaiian forest birds, one of the most imperiled groups of birds in the world, are in crisis.  Sadly, 68 percent of Hawaiʻi's known endemic bird species have gone extinct since the arrival of humans due to habitat loss, disease, and the introduction of invasive predators.  Of the 37 endemic species that remain, 33 are currently listed under the ESA, although nine have not been observed recently and are believed to be extinct.

3.      The vulnerable iʻiwi has declined significantly in recent decades due to threats including climate change, habitat destruction, and diseases.

4.      Once one of the most abundant native forest birds in Hawaiʻi, the ʻiʻiwi now persists on only three islands, with the population on one of these

islands likely to go extinct by 2050.  82 Fed. Reg. at 43,875, 43,880 (Sept. 20, 2017).

5.      In light of the significant threats facing 'i'iwi, on September 20, 2017, the Service listed 'i'iwi as a "threatened" species under the ESA.  *Id.* at 43,873.

6.      When the Service lists a species as endangered or threatened, it must designate critical habitat for that species, to the greatest extent prudent and determinable.  16 U.S.C. § 1533(a)(3)(A)(i).  Under limited circumstances, the Service may extend that deadline to no more than one additional year.  *Id.* § 1533(b)(6)(C)(ii).

7.      Additionally, subsection 4(f) of the ESA imposes a mandatory, nondiscretionary duty on the Service to develop and implement recovery plans for the conservation of each species listed as endangered or threatened.  16 U.S.C. § 1533(f)(1).

8.      Regardless of these non-discretionary statutory requirements, to date, the Service has not designated critical habitat for the 'i'iwi nor developed a final recovery plan for this species, as required by section 4 of the ESA.

9.      Time is of the essence in protecting this iconic forest bird.  The 'i'iwi's very existence remains at risk until the Service fulfills its mandatory statutory duties.

4

10.    The Service's failure to timely designate critical habitat and prepare a legally required recovery plan for ʻiʻiwi violates section 4(f) of the ESA, 16 U.S.C. § 1533, and alternatively constitutes agency actions unlawfully withheld and unreasonably delayed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1).  Accordingly, the Center brings this action against the Service to (1) secure declaratory relief that the Service is in violation of the ESA for failing to timely designate critical habitat for ʻiʻiwi, (2) secure declaratory relief that the Service is in violation of the ESA for failing to create a legally valid recovery plan for the ʻiʻiwi, (3) enjoin the agency to designate critical habitat according to a timeline established by the Court and (4) enjoin the agency to issue a recovery plan according to a timeline established by the Court.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this action pursuant to 16 U.S.C. §§ 1540(c) & (g) (action arising under the ESA and citizen suit provision), 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 (Administrative Procedure Act or "APA"), and 28 U.S.C. § 1361 (mandamus).

12.    The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 16 U.S.C. § 1540(g) (citizen-suit provision of the ESA), and 5 U.S.C. §§ 701-706 (APA).

13.     By written notice sent on October 13, 2020, the Center informed
Defendants of their violation more than sixty days prior to the filing of this
Complaint, as required by the ESA.  16 U.S.C. § 1540(g)(2)(C).  Despite receipt of
the Center's notice letter, the Service has failed to remedy its violation of the ESA.

14.     Venue is proper in the U.S. District Court for the District of Hawai'i
pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or
omissions giving rise to the claim occurred in this judicial district and the
threatened 'i'iwi occurs in this judicial district.

15.     An actual, justiciable controversy exists between the parties within the
meaning of 28 U.S.C. § 2201.

16.     The Center has no adequate remedy at law.  The Service's continuing
failure to comply with the ESA will result in irreparable harm to the 'i'iwi, to the
Center and the Center's members, and to the public.  No monetary damages or
other legal remedies can adequately compensate the Center, its members, or the
public for this harm.

17.     The federal government has waived sovereign immunity in this action
pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

## **PARTIES**

18.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center")
is a non-profit 501(c)(3) membership corporation with offices throughout the

United States, including Hawaiʻi.  Through science, policy, and environmental law, the Center is actively involved in species and habitat protection issues throughout the United States and abroad, including efforts related to Hawaiʻi's imperiled forest birds, and the effective implementation of the ESA.  The Center has more than 84,000 members throughout the United States, including Hawaiʻi, with a direct interest in the survival and recovery of threatened and endangered species. The Center is highly dedicated in conserving fragile and impacted ecosystems and the species that depend on them.  The Center's members and staff have researched, studied, observed, and sought protection for the ʻiʻiwi.  In addition, the Center's members and staff have visited and enjoyed the forests of Hawaiʻi where the ʻiʻiwi occur, and they have sought out and observed these species in Hawaiʻi.  The Center's members and staff have plans to continue to visit and observe, or attempt to observe, ʻiʻiwi in the future.  The Center's members and staff derive scientific, recreational, cultural, conservation, and aesthetic benefits from ʻiʻiwi's existence in the wild.  The Center's members' and staff's enjoyment of ʻiʻiwi is dependent on the continued existence of healthy, sustainable populations in the wild.  The Service's failure to designate critical habitat for the ʻiʻiwi and to develop a valid recovery plan directly harms these interests.  The Center brings this action on behalf of itself and its adversely affected members.

7

19.    The Center and its members are adversely affected or aggrieved by the Service's inaction and are entitled to judicial review of such inaction under the ESA and the APA.  The Service's failure to comply with the ESA's nondiscretionary deadlines to designate critical habitat and develop a recovery plan for the 'i'iwi denies these threatened birds vital protections that are necessary for their survival and recovery.  Without the additional protections that would be available subsequent to the designation of critical habitat, 'i'iwi are more likely to continue to decline and become extinct.  Without a legally valid recovery plan, the myriad of threats facing the 'i'iwi will continue to compound.  The Center's members and staff are therefore injured because their use and enjoyment of 'i'iwi are threatened by the Service's violations of the ESA.  The above-described cultural, aesthetic, recreational, scientific, educational and other interests of the Center and its members have been, are being and, unless the relief prayed herein is granted, will continue to be adversely affected and irreparably injured by Defendants' continued refusal to comply with their obligations under the ESA. The relief sought in this case will redress these injuries.

20.    The Service's failure to comply with the ESA's deadlines has also resulted in informational and procedural injury to the Center, because the ESA affords the Center procedural and informational rights, including the right to comment on and otherwise participate in the statutorily-mandated critical habitat

and recovery plan processes triggered by an ESA listing. The Service's failure to timely designate critical habitat and development of a recovery plan frustrates these rights. These are actual, concrete injuries to the Center, caused by the Service's failure to comply with the ESA, its implementing regulations, and the Administrative Procedure Act. The relief requested will fully redress those injuries.

21.     Defendant SCOTT DE LA VEGA is the Acting Secretary of the United States Department of the Interior and is the federal official with final responsibility for making decisions and promulgating regulations required by and in accordance with the ESA, including the timely designation of critical habitat and development of a valid recovery plan, and to comply with all other federal laws applicable to the Department of the Interior. Acting Secretary de la Vega is sued in his official capacity.

22.     Defendant U.S. FISH AND WILDLIFE SERVICE is an agency of the United States Government, within and under the jurisdiction of the Department of the Interior. Through delegation of authority from the Secretary of the Interior, the Service administers and implements the ESA for non-marine wildlife. 50 C.F.R. § 402.01(b). This authority encompasses timely compliance with the ESA's mandatory deadlines to designate critical habitat and develop and implement a recovery plan.

## LEGAL BACKGROUND

23.     The Supreme Court has declared the Endangered Species Act "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  As the Court recognized, "Congress intended endangered species be afforded the highest of priorities." *Id.* at 174.  Accordingly, the purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ."  16 U.S.C. § 1531 (b).

24.     The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." *Id.* § 1532(3).  Thus, the ultimate goal of the ESA is not only to temporarily save endangered and threatened species from extinction but to recover these species to the point where they no longer need ESA protection.

25.     To that end, the Endangered Species Act requires the Service to protect imperiled species by listing them as "endangered" or "threatened" when they meet the statutory listing criteria. *Id.* § 1533(a)(1).  A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range."

*Id.* § 1532(6).  A species is threatened if it is "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

26.    Once a species is listed, it receives a host of important protections designed to prevent its extinction and aid its recovery, including one of the most crucial protections — safeguards for its "critical habitat."  *Id.* § 1533(a)(3)(A).

27.    Concurrent with listing a species, the ESA requires the designation of critical habitat.  16 U.S.C. § 1533(a)(3)(A)(i) ("The Secretary . . . shall, concurrently with making a determination . . . that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat."); *see also id.* § 1533(b)(6)(C).

28.    In limited circumstances, the Service may extend the designation of critical habitat for no more than one year.  If the Secretary finds that critical habitat is "not determinable" at the time of listing, it "may extend the one-year period . . . by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat."  16 U.S.C. § 1533(b)(6)(C)(ii).

29.    Critical habitat means "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological

11

features (I) essential to the conservation of the species and (II) which may require

special management considerations or protection;" and unoccupied areas "essential

for the conservation of the species."  16 U.S.C. § 1532(5).

30.     Congress recognized the importance of habitat protections to the

conservation and recovery of endangered species.  The legislative history of the

ESA clearly demonstrates Congress understood the importance of timely critical

habitat designation in conserving listed species:

> [C]lassifying a species as endangered or threatened is only the first step
> in insuring its survival.  Of equal or more importance is the
> determination of the habitat necessary for that species' continued
> existence. . . . If the protection of endangered and threatened species
> depends in large measure on the preservation of the species' habitat,
> then *the ultimate effectiveness of the Endangered Species Act will
> depend on the designation of critical habitat.*

H.R. Rep. No. 94-887 at 3 (1976) (emphasis added).

31.     Time has proven the wisdom of Congress' requirement that the

Service designate critical habitat for listed species.  Studies demonstrate that

species with critical habitat are more than twice as likely to be in recovery than

those without it.

32.     The ESA does not safeguard a species' critical habitat until the

Service designates it.  Therefore, it is imperative that the Service meticulously

follow the Act's procedures and deadlines to ensure it designates critical habitat in

a timely manner.

33.     Additionally, as part of the statutory scheme to conserve endangered and threatened species, Section 4(f) the ESA provides that the Service "shall develop and implement . . . recovery plans . . . for the conservation and survival of endangered species and threatened species listed pursuant to [the ESA], unless [the Service] finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1).

34.     In developing a recovery plan, the Service "shall, to the maximum extent practicable . . . incorporate in each plan—

(i)     a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii)     objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii)     estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal."  16 U.S.C. § 1533(f)(1)(B).

35.     The ESA further provides that in developing and implementing recovery plans, the Service may obtain the services of appropriate public and private agencies and institutions, and other qualified persons.  16 U.S.C. § 1533(f)(2).  The Service shall report to Congress every two years on the status of efforts to develop and implement recovery plans for all listed species and on the status of all species for which plans have been developed.  16 U.S.C. § 1533(f)(3).

13

The Service shall provide for public notice of, and comment on, any new or revised recovery plan prior to its final approval and shall consider all information presented during the public comment period prior to final approval of the new or revised recovery plan. 16 U.S.C. § 1533(f)(4). The Service, prior to implementation of a new or revised recovery plan, shall consider all information presented during the public comment period. 16 U.S.C. § 1533(f)(5).

36. In the absence of a statutory timeline for developing recovery plans, the Service has adopted a policy that it will develop a recovery plan in compliance with 16 U.S.C. § 1533(f) within two and a half years of promulgation of the final regulation listing an endangered or threatened species. *See* 59 Fed. Reg. 34272 (Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy on Recovery Plan Participation and Implementation under the Endangered Species Act).

37. Section 7(a)(1) of the ESA imposes an "affirmative duty" on all federal agencies to conserve listed species. It provides that federal agencies shall "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species . . . ." 16 U.S.C. § 1536(a)(1).

38. The ESA's citizen-suit provision provides for judicial review where the Service has failed to perform a mandatory duty under ESA section 4. 16

14

U.S.C. § 1540(g)(1)(C).  The APA provides the standard of review, 5 U.S.C. § 706(2)(A).  Furthermore, under the APA, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

## FACTUAL BACKGROUND

39.     'I'iwi (*Drepanis coccinea*) are a medium-sized Hawaiian forest bird known for their iconic bright red plumage, black wings, and distinctive long, curved bill.

40.     The 'i'iwi's diet consists primarily of nectar from the blossoms of the 'ōhi'a (*Metrosideros polymorpha*) and mamane tree (*Sophora chrysophylla*). 'I'iwi migrate seasonally to follow 'ōhi'a and mamane blooms, leaving its high elevation forest habitat and descending to lower elevations in search of nectar.

41.     The 'i'iwi's seasonal movements to lower elevations expose this threatened endemic bird to fatal avian diseases.

42.     The 'i'iwi was once one of the most abundant native forest birds in Hawai'i, "found from sea level to the tree line across all major islands."  82 Fed. Reg. at 43,875.  Unfortunately, 'i'iwi can no longer be found across much of its historical range today.  With the introduction of mosquitoes and mosquito-borne diseases such as avian malaria and avian pox, 'i'iwi have been forced out of lower elevations, where mosquito prevalence and disease proliferation are higher, into high elevation disease-free areas.  *Id.*

43.    Like many native Hawaiian forest birds, ʻiʻiwi are highly susceptible to avian malaria.  In fact, the ʻiʻiwi is "one of the most vulnerable species," with an extremely low resistance to avian malaria and an average 95 percent mortality rate. *Id.* at 43876.  The combination of low resistance and high mortality means that nearly every ʻiʻiwi that comes into contact with avian malaria dies from the disease.  Therefore, conservation of remaining high-elevation, disease-free habitat is of utmost importance for the continued survival of ʻiʻiwi.

44.    Warmer temperatures associated with climate change further exacerbate the eminent danger of avian malaria facing ʻiʻiwi.  Mosquitoes are temperature-limited species that cannot currently survive at higher elevations in Hawaiʻi due to cooler temperatures.  Unfortunately, due to climate change, temperatures at high elevations in Hawaiʻi are increasing at a "disproportionately greater" rate than at mid and low elevations.  82 Fed. Reg. at 43,879.  This warming allows mosquitoes to expand their range into higher elevations, bringing with them avian malaria and avian pox.  Furthermore, the virus that causes avian malaria survives better in warmer temperatures, meaning warmer high elevation habitats will no longer be safe refugia from the disease.  *Id.*

45.    As warmer temperatures facilitate the spread of mosquitoes and avian malaria, ʻiʻiwi's disease-free habitat contracts.  This is having a devastating impact on the threatened ʻiʻiwi.  For example, on Kauaʻi, warmer temperatures now allow

mosquitoes and the avian malaria virus to survive at all elevations, exposing 'i'iwi to the disease throughout its range. *Id.* at 43880.  In response, the Kaua'i 'i'iwi population has decreased drastically since 2000 and is expected to go extinct on the island by 2050. *Id.*

46.    In addition to disease limits on the 'i'iwi's range, massive die-offs of 'ōhi'a tree, which 'i'iwi depend on for nesting and food, further limit the 'i'iwi's available habitat. *Ceratocystsis spp.*, an introduced fungal disease that emerged on the island of Hawai'i, causes a disease known as rapid 'ōhi'a death ("ROD"). *Id.* ROD can infect entire stands of 'ōhi'a trees, killing upwards of 50 percent of an infected stand. *Id.*  Though originally limited to the island of Hawai'i, as of June 2020, ROD has spread to Kaua'i, Maui, and O'ahu.  Mapping by the State of Hawai'i showed more than 60,000 ha of ROD-symptomatic 'ōhi'a forests.  With no effective means of containing ROD, 'ōhi'a forest death poses a significant risk to the continued survival of 'i'iwi.

47.    Due to the extensive threats of mosquito-borne diseases, such as avian malaria and avian pox, rapid 'ōhi'a death, and climate change, the Service listed the 'i'iwi as a "threatened" species under the ESA on September 20, 2017.  82 Fed. Reg. 43,873.  The ESA requires critical habitat designation, "to the maximum extent prudent and determinable," at the time of this listing determination, except

under specific circumstances.  16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(A); *see also id*.

§ 1533(b)(6)(C)(i-ii).

48.     The Service failed, however, to designate critical habitat concurrently

with its September 20, 2017 rule listing ʻiʻiwi as threatened.  82 Fed. Reg. 43,873.

Since the Service found critical habitat was not determinable at that time, the

Service had until September 20, 2018, to designate critical habitat for ʻiʻiwi.  *See*

16 U.S.C. § 1533(b)(6)(C)(i-ii).

49.     To date, the Service has failed to propose critical habitat for ʻiʻiwi.

Without protections for its critical habitat, ʻiʻiwi will continue to lose what little

disease-free habitat remains throughout its range.

50.     The Service has also failed to develop and implement a recovery plan

for ʻiʻiwi as required by the ESA.  16 U.S.C. § 1533(f).

51.     Despite the Service's own policy requiring it to develop a final

recovery plan within years of listing a species, ʻiʻiwi has now gone over three years

without a recovery plan.  *See* 59 Fed. Reg. 34272.

52.     The Service's failure is inexcusable as it has recognized that ʻiʻiwi

face population declines of 70 to 90 percent over the next 80 years if actions are

not taken to minimize the threats of disease and habitat loss.  *See* 82 Fed. Reg. at

43,883.

53.     The Service's delay in designating critical habitat and developing and implementing a recovery plan for 'i'iwi violates its non-discretionary duties under the ESA, deprives these special birds of protections to which they are legally entitled, and inexcusably leaves them at increased risk of extinction.

## FIRST CLAIM FOR RELIEF

### Violation of the Service's Nondiscretionary Duties under Section 4 of the Endangered Species Act (ESA Citizen-Suit Claim)

### Failure to timely designate critical habitat for 'i'iwi

54.     The Center re-alleges and incorporates by reference all allegations set forth in this Complaint, as though fully set forth below.

55.     Under section 4 of the ESA, the Service has a mandatory, non-discretionary duty to designate critical habitat for 'i'iwi concurrently with its listing decision, 16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(C), or within one year of proposing critical habitat, *id.* § (b)(6)(A)(ii).

56.     To date, the Service has failed to designate critical habitat for 'i'iwi.

57.     The Service's failure to timely designate critical habitat for 'i'iwi violates section 4 of the ESA, 16 U.S.C. § 1533.

## SECOND CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act (In the Alternative to Plaintiffs' First Claim for Relief)

### Agency Action Unlawfully Delayed or Unreasonably Withheld Under APA, 5 U.S.C. § 706(1)

19

58.     The Center re-alleges and incorporates by reference all allegations set forth in this Complaint, as though fully set forth below.

59.     Under the APA, a reviewing court has the authority to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

60.     Timely designation of critical habitat for ʻiʻiwi constitutes a discrete action the Service was required to take pursuant to 16 U.S.C. § 1533(f).

61.     The Service's continued failure to designate critical habitat for ʻiʻiwi violates the ESA, 16 U.S.C. § 1533, and constitutes an agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA, 5 U.S.C. § 706(1).

### THIRD CLAIM FOR RELIEF

### Violation of the Service's Nondiscretionary Duties under Section 4 of the Endangered Species Act (ESA Citizen-Suit Claim)

#### Failure to develop and implement a recovery plan for ʻiʻiwi

62.     The Center re-alleges and incorporates by reference all allegations set forth in this Complaint, as though fully set forth below.

63.     Under section 4(f) of the ESA, the Service has a non-discretionary duty to "develop and implement" recovery plans for the "conservation and survival" of listed species. 16 U.S.C. § 1533(f)(1).

64. Because the Service never developed a recovery plan for the ʻiʻiwi, the Service has failed to "develop and implement" a plan for the "conservation and survival" of the ʻiʻiwi, in violation of ESA section 4(f), 16 U.S.C. § 1533(f)(1).

## FOURTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act
### (In the Alternative to Plaintiffs' Third Claim for Relief)

**Agency Action Unlawfully Delayed or Unreasonably Withheld Under APA, 5 U.S.C. § 706(1)**

65. The Center re-alleges and incorporates by reference all allegations set forth in this Complaint, as though fully set forth below.

66. Under the APA, a reviewing court has the authority to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

67. Timely development and implementation of a recovery plan for ʻiʻiwi constitute a discrete action the Service was required to take pursuant to 16 U.S.C. § 1533(f).

68. The Service's continued failure to develop and implement a valid recovery plan for ʻiʻiwi violates the ESA, 16 U.S.C. § 1533, and constitutes an agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA, 5 U.S.C. § 706(1).

## <u>REQUEST FOR RELIEF</u>

For the reasons stated above, the Center respectfully requests that the Court grant

the following relief:

1.   Declare that the Service is in violation of section 4(f) of the ESA, 16

U.S.C. § 1533(f), or the APA, 5 U.S.C. § 706(1);

2.   Order the Service to propose and finalize critical habitat rules for

'i'iwi by dates certain;

3.   Order the Service to prepare and implement a legally valid recovery

plan for 'i'iwi according to a timeline established by the Court;

4.   Award the Center its reasonable fees, costs and expenses associated

with this litigation pursuant to 16 U.S.C. § 1540(g)(4) and/or 28

U.S.C. § 2412(d); and

4.   Grant such other and further relief as the Court deems just and proper

to remedy the Service's violations of law.

DATE:  March 3, 2021

Respectfully Submitted,

*/s/ Maxx Phillips*
Maxx Phillips (HI Bar No. 10032)
CENTER FOR BIOLOGICAL DIVERSITY
1188 Bishop Street, Suite 2412
Honolulu, HI 96813
Phone: (808) 284-0007
Email: mphillips@biologicaldiversity.org

Amy R. Atwood (OR Bar No. 060407)
*pro hac vice application forthcoming*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Phone: (917) 717-6401
Email: atwood@biologicaldiversity.org

*Attorneys for Plaintiff*